[Civ. No. 35622. First Dist., Div. Four. Feb. 25, 1976.]

HENRY E. MIHESUAH, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and
UNION OIL COMPANY, Respondents.

**COUNSEL**

Van Bourg, Allen, Weinberg, Williams & Roger, Barry J. Williams and George C. Allen for Petitioner.

Frank H. Batlin, Charles Lawrence Swezey, Philip M. Miyamoto, Raymond G. Agnew, Herlihy, Herlihy, Jones & Nelson, Jack Sisk and Jones, Nelson, Burns & Endres for Respondents.

**OPINION**

**RATTIGAN, Acting P. J.**—Petitioner Henry E. Mihesuah received multiple injuries in an industrial accident. After protracted proceedings upon his application for benefits pursuant to the workers' compensation law, respondent Workers' Compensation Appeals Board (hereinafter "Board") filed an opinion and decision after reconsideration in which it affirmed a referee's prior determination that petitioner had sustained a 77 percent permanent disability in the accident.

We granted review for the principal purpose of considering petitioner's contentions (1) that a multiple-disability rating of 92 percent is commanded by pertinent provisions of the permanent disabilities rating schedule which apply in his case and (2) that the rating there scheduled is conclusive. We reject both of the stated contentions, and affirm the Board's opinion and decision accordingly.

Petitioner's accident occurred on April 29, 1969. After initial proceedings upon his application for industrial benefits, the Board filed an opinion and order after reconsideration in which it denied benefits upon the ground that his cause of action was barred by the statute of limitations. Division Three of this court granted review, annulled the opinion and order, and remanded the cause to the Board for further proceedings. (*Mihesuah* v. *Workmen's Comp. Appeals Bd.* (1972) 29 Cal.App.3d 337 [105 Cal.Rptr. 561].) The consequences of the reopened proceeding are before us on the present review.

When the accident occurred, petitioner was working in the course and scope of his employment by respondent Union Oil Company of California (hereinafter "the employer") as a mechanic. He sustained injuries to his chest and left knee. (See *Mihesuah* v. *Workmen's Comp. Appeals Bd., supra,* 29 Cal.App.3d 337 at pp. 338-339.) The chest injury was treated by Mortimer A. Benioff, M.D., a pulmonary specialist. The knee injury was treated by A. M. Auerbach, M.D., an orthopedist. One written report by Dr. Benioff, and several reports by Dr. Auerbach, were filed in the course of petitioner's reopened proceeding.

The matters presently in controversy commenced when a Board referee made two successive requests, to the Permanent Disability Rating Bureau (hereinafter "Bureau"), for a formal permanent disability rating in petitioner's case. Both requests reached the same Bureau rating specialist, who returned, in sequence and respectively, recommended ratings of 69 percent and 77 percent.[1] At the request of petitioner and the

---

[1] Both requests were made and returned on a form designated "DIA WCAB Form 75 (rev. 2-72)." For a specimen of that form, see California Workmen's Compensation Practice (Cont. Ed. Bar 1973) section 15.20. For an exposition of the Bureau rating procedure in which it is employed (and which was followed in all instances involving the Bureau in the present case; see *id.,* §§ 15.7-15.21). (We hereinafter cite this Continuing Education of the Bar work as "CEB" only.)

On the first of the two forms successively transmitted to the Bureau as here described in the text, the referee stated petitioner's disability as "Back and left lower extremity disability sufficient to limit applicant [petitioner] to semi-sedentary work." On the second, she described it as "Back, left leg and lung disability sufficient to limit applicant to sedentary work."

employer, a hearing was conducted at which the specialist was cross-examined by their counsel. He testified, among other things, that he had not used "multiple disability tables" in formulating either rating.

The referee filed "Findings And Award," and a "Report Of Referee," on December 13, 1973. She apparently followed the specialist's second recommendation, stating in both documents her determination that petitioner had "sustained 77% permanent disability." (See the text at fn. 1, *ante.*) The "Findings And Award" granted him permanent disability indemnity upon the basis of the 77 percent figure. The Board granted a petition for reconsideration filed by the employer, stating in its "Opinion And Order Granting Reconsideration" that it was "constrained to reevaluate the permanent disability" by reason of "the referee's failure to separately describe all factors of permanent disability," in pertinent request to the Bureau (see fn. 1, *ante*), as required by *Hegglin* v. *Workmen's Comp. App. Bd.* (1971) 4 Cal.3d 162 [93 Cal.Rptr. 15, 480 P.2d 967].[2]

On March 13, 1974, the Board submitted to the Bureau another Form 75 (see fn. 1, *ante*) in which the factors of petitioner's permanent disability were separately stated as follows:

"CHEST: Post traumatic deformity, susceptibility to infection and decrease in respiratory function which in and of itself would limit applicant [petitioner] to light work.

"LEFT KNEE: Moderate to severe medial and lateral instability which requires wearing knee brace if applicant [petitioner] has to walk for any length of time and limits him to semi-sedentary work. He can do light lifting but little bending which involves the injured knee. He can do light work which involves some sitting or some standing but cannot place strains on knee such as those involved in lifting over 25 pounds, long periods of standing, and repetitive bending or stooping."[3]

The new request reached the same Bureau rating specialist who had made the previously recommended ratings. He returned it to the Board on March 26, 1974, this time showing a standard rating of 70 percent, formulary adjustments for petitioner's age and occupation, and a

---

[2]The Board expressly cited *Hegglin* as authority pertaining to "the referee's failure to separately describe all factors of permanent disability."

[3]Petitioner does not dispute the accuracy of either of these descriptions as summations of the medical reports by Drs. Benioff and Auerbach, respectively.

recommended permanent disability rating of 74 percent as the result. Petitioner challenged the new rating and requested another opportunity to cross-examine the specialist. The employer made a similar request.

A further hearing was conducted before a new referee on May 22, 1974, at which the specialist was cross-examined by counsel for petitioner and the employer as requested. The referee then ordered the matter referred to the Board "for further action," and submitted to it a report dated May 24, 1974 ("Minutes Of Hearing And Summary Of Evidence"), in which he recounted the specialist's new testimony. Our summary of that testimony paraphrases and quotes the referee's May 24 report, with some interpolation and emphases added in the quoted passages, as follows:

In arriving at the 74 percent rating, the specialist had considered nothing except the "factors of disability" stated to him in the Board's request of March 13, 1974. (See the text at fn. 3, *ante.*) With respect to the "factors relating to the chest alone," he assigned a "standard" rating of 50 percent which, after adjustment for petitioner's age and occupation, produced a permanent disability rating of 56 percent attributable to the chest injury. Working from the "factors relating to the left knee alone," he assigned a "standard" rating of 60 percent which, similarly adjusted, produced a permanent disability rating of 69 percent for petitioner's knee injury.

"He [the specialist] arrived at a 70 percent standard rating on these factors because the factors involved two areas, respiratory and left knee. The factors suggest a minimum [rating] of 60 percent for semi-sedentary work limitation [as to petitioner's knee] and additional disability related to the respiratory complaints limiting to light work, suggesting an overall disability greater than 60 percent. In his opinion, the factors *suggested a disability of sedentary work or 70% standard*" rating, although "[u]sing multiple tables and combining a 69% and 56% rating the rating would be 92%."[4]

---

[4]The first passage here quoted from the referee's May 24 report is based upon the testimony given by the specialist in the following exchange: "Q. Now, this you felt to be a judgment rating on the . . . instructions that were tendered to you, did you not . . . ? A. [by the specialist] *The overall disability would suggest something in the area of a sedentary* or 70% standard. REFEREE: Well, his question is that conclusion is a judgment on your part? WITNESS: *It's my opinion, yes.* Q. . . . In arriving at your impression, coming to your judgment as to what standards to use, you considered that some of the problems he [petitioner] would have with his chest disability were of the same nature and the same type of problems he would have with the left lower extremity disability; is that a fair

"He [the specialist] has heard generally of the case *Hegglin* v. *W.C.A.B.*, but has not read the case and has not received any instructions from the . . . Bureau or its head . . . in regard to the Hegglin case."[5]

On August 6, 1974, the Board filed the "Opinion And Decision After Reconsideration" which is presently under review. In pertinent part, it recites the previously summarized events as follows:

"The Board granted reconsideration in this case, among other things, to re-evaluate the nature and extent of applicant's [petitioner's] permanent disability in view of the referee's acknowledged failure to separately describe all of the factors. [See fn. 2 and accompanying text, *ante.*] Thereafter, new instructions were prepared and forwarded to the . . . Bureau, whose recommended rating thereon resulted in a special hearing to cross-examine the rating specialist. . . .

"As far as the nature and extent of applicant's permanent disability is concerned, the factors contained in our instructions to the . . . Bureau dated March 13, 1974, were taken directly from the uncontroverted reports of Dr. Auerbach and Dr. Benioff. The rating specialist's conclusions thereupon are similarly uncontradicted."

The Board then directly quoted the referee's May 24, 1974, report of the specialist's testimony as follows (the indicated deletions and interpolations are the Board's; italics added):

" 'He arrived at a 70% standard rating on these factors because the factors involved two areas, respiratory and left knee. The factors suggest a minimum of 60% for semi-sedentary work limitation and additional disability related to the respiratory complaints limiting to light work, suggesting an overall disability greater than 60%. In his opinion, the factors suggested a disability of sedentary work or 70% standard.

" 'The rating for the left knee [alone], after adjustment for age and occupation, would be . . . 69%. The rating for the chest [alone] would be . . . 56%.

statement? A. *There might be some overlap; however, I think there are two distinct areas of disability here.*" (Italics added.)

The second passage here quoted from the report is based upon this testimony only: "Q. Would you please give me *the multiple table compilation* for a 69% and a 56%? A. [by the specialist] 92%." (Italics added.)

[5]The obvious reference here is to *Hegglin* v. *Workmen's Comp. App. Bd., supra,* 4 Cal.3d 162, which the Board had cited as the basis for its granting consideration of the award made on December 13, 1973. (See the summary of its "Opinion And Order Granting Reconsideration" appearing in the text hereof at fn. 3, *ante.*)

" *'Using multiple tables* and combining . . . the rate would be 92%.'

"Thus," the Board continued, "it appears to us that there is evidence to support a rating of no less than 69% and no more than 92%. However, the rating specialist testified that in his judgment 70% was warranted under the circumstances. His opinion is not only well within the range of evidence available to him, but is also uncontradicted. Therefore, we are of the opinion thàt a finding that applicant sustained a 74% [*sic*] permanent disability as the result of his injury [*sic*] herein is fully justified by the evidence.

"
.    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"For the foregoing reasons, IT IS HEREBY ORDERED that the Findings and Award filed herein on December 13, 1973, . . . [is] . . . adopted and affirmed as the Decision After Reconsideration of the Appeals Board."[6]

\*    \*    \*    \*

Because tne questions on review involve tne use and effect of the "permanent disabilities rating schedule" and the "multiple disabilities rating table," we find it necessary to identify both at this point. The master "permanent disabilities rating schedule" is a single document adopted, and amended from time to time, by the administrative director of the Division of Industrial Accidents (of the Department of Industrial Relations) pursuant to the authority vested in him by subdivision (b) of Labor Code section 4660.[7] (See *Department of Motor Vehicles* v.

---

[6]The Board thus sustained the specialist's final rating of *74* percent, but "adopted and affirmed" the 1973 award in which the referee had fixed petitioner's permanent disability at *77* percent. According to statements in the pleadings on this review, the discrepancy between the two figures may be attributable to a "clerical error" which the Board has not corrected, to show the 74 percent rating it actually upheld, because the employer has not requested correction. No request for correction or modification having been addressed to this court by any party, we leave the "Decision After Reconsideration" as we found it in this respect.

[7]The full text of this section provides:

"4660. (a) In determining the percentages of permanent disability, account shall be taken of the nature of the physical injury or disfigurement, the occupation of the injured employee, and his age at the time of such injury, consideration being given to the diminished ability of such injured employee to compete in an open labor market.

"(b) The administrative director may prepare, adopt, and from time to time amend, a schedule for the determination of the percentage of permanent disabilities in accordance with this section. Such schedule shall be available for public inspection, and without formal introduction in evidence shall be prima facie evidence of the percentage of permanent disability to be attributed to each injury covered by the schedule.

"(c) Any such schedule and any amendment thereto or revision thereof shall apply prospectively and shall apply to and .govern only those permanent disabilities which

*Workmen's Comp. Appeals Bd. (Payne)* (1971) 20 Cal.App.3d 1039, 1043 [98 Cal.Rptr. 172]; CEB, §§ 15.7, 15.11-15.12.) It is currently published in a 1966 edition under the title "Schedule For Rating Permanent Disabilities Under Provisions Of The Labor Code Of The State of California," and with the designation "DIA Form 302 (rev. 6-66)." (See CEB, § 15.7.) We hereinafter cite it on occasion as the "master schedule." The "multiple disability tables" mentioned throughout the present proceeding (see, e.g., the text at fn. 4, *ante*) appear on page 82 of the master schedule ("Table For Determining Multiple Disability Ratings"), preceded by an explanatory text ("Rating Multiple Disabilities") on page 81.

In the *Hegglin* decision also cited throughout the proceeding (see the text at fns. 2 and 5, *ante*), the Supreme Court considered the use of the multiple disability tables where, as in the present case, the Board requests from the Bureau a rating of multiple disabilities caused by a single industrial accident. (*Hegglin* v. *Workmen's Comp. App. Bd., supra,* 4 Cal.3d 162, 172-174.) As pertinent here, the *Hegglin* court stated: "We hold that in cases involving multiple factors of disability caused by a single industrial accident the Board must, in any instructions it may direct to the rating bureau, fully describe each separate factor of disability. Any *overlap* of the factors of disability thus described · *is adequately taken into account,* and the pyramiding of *disabilities is properly avoided, by application of the multiple disabilities rating schedule."* (*Id.,* at p. 174 [italics added].)

The parties agree that the Board complied with the just-quoted *Hegglin* holding when it separately described the two factors of petitioner's disability in the rating request it made to the Bureau on March 13, 1974. (See text at fn. 3, *ante.*) They further agree that there is *some* "overlap" between the two factors. None of the parties challenges the separate ratings of 69 percent and 56 percent which the Bureau specialist adopted as to petitioner's knee injury and chest injury, respectively. They also agree with the specialist's testimony that the mechanical processing of these two ratings into the multiple disabilities rating schedule produces a tabulated rating figure of 92 percent. It is at this point that their disagreement presents the problem before us.

Petitioner contends in effect that, given the undisputed element of *some* "overlap" between the two separate factors of disability caused by

result from compensable injuries received or occurring on and after the effective date of the adoption of such schedule, amendment or revision, as the fact may be."

the single 1969 accident in which he was injured, the permissible exercise of any judgment by the rating specialist began and ended when he assigned a separate rating to each of the factors; that the above-quoted *Hegglin* holding required him to process the two ratings into the multiple disabilities rating schedule, and precluded him from recommending any composite rating other than the tabulated result of 92 percent; that this conclusion is commanded by the language of the *Hegglin* court quoted above; that the rating automatically produced by the specialist in this procedure is conclusive upon the Board; and that, because the specialist in this case did not follow the procedure and the Board adopted his rating, the opinion and decision under review is not supported by substantial evidence.

We first reject that portion of petitioner's argument in which he asserts that the Bureau specialist's rating, however calculated, is conclusive upon the Board in any case. ■ A Bureau specialist who is consulted by the Board, for the purpose of evaluating one or more permanent disabilities in a worker's compensation proceeding, is not the trier of fact in the proceeding. (CEB, § 15.38.) He is an expert witness whose testimony consists of the rating he recommends (*ibid.*) and the Board, which *is* the trier of fact, is not bound by it. (*Ibid.*) It necessarily follows that, although the Board commonly adopts the recommended rating (*ibid.*), it is not bound by the extent to which the specialist followed or departed from the multiple disabilities rating schedule in formulating it.

The question of law thus presented by petitioner is whether the above-quoted *Hegglin* language bound the *specialist* to the 92 percent figure yielded by the multiple disabilities rating schedule. Whether the Board's opinion and decision is supported by substantial evidence is a corollary question which is essentially one of fact.

The answer to the question of law is found in the prefatory text of the multiple disabilities rating schedule itself, where the administrative director has prescribed the arithmetical formula by which a composite rating is calculated in any case involving two disabilities. (Form 302 [1966 ed.], p. 81.[8] See CEB, §§ 15.44-15.45.) According to the last

[8]The text sets out the pertinent language of the formula, which in essence is both arbitrary and simplistic, as follows: "In rating multiple disabilities . . . , it is first necessary to compute the rating which would apply to each component disability as it would rate if it stood alone. These ratings are then arranged in order of magnitude. First, take the rating for the major disability. It is then assumed that the remaining capacity will equal 100% minus the rating for the major disability. Therefore, the rating for the secondary disability is applied to this remaining capacity and the resulting percentage added to the rating for the major disability. The combined rating for the two disabilities is this sum

sentence of the first paragraph of the formula (see fn. 8, *ante*), the actual "schedule" which follows it is no more than a convenient tabulation of the process it describes. According to its second paragraph, the formula itself is only a "guide" to be employed in following and concluding the process: "[t]he final rating will be the result of consideration of the entire picture of disability and possibility of employability." (See *ibid.*)

■ From the language last quoted, it is clear that where "overlap" exists between two factors of permanent disability caused by a single accident (which petitioner concedes to be the case here), and where a composite rating is requested of the Bureau, the rating which emerges rests upon the extent of "overlap" as assessed by the rating specialist in the exercise of his expert judgment with the tabulated formula serving as a "guide." The *Hegglin* court did not mention this status of the multiple disability table as a "guide." Consequently, we do not read in its language as to "overlap" (that "[a]ny overlap of the factors of disability thus [separately] described is adequately taken into account . . . by application of the multiple disabilities rating schedule") a statement that the specialist's judgment was to yield to the composite rating tabulated.

We interpret the language, rather, that a "factor of overlap is adequately taken into account" when the specialist enters the table after having rated the separate factors of disability according to his judgment as to each. The composite rating shown in the table by the juxtaposition of the two separate threshold ratings (95 percent in this case, shown in the table by 56 percent vis-a-vis 69 percent) operates as a ceiling upon the final rating which he may reach. The final rating, however, is the product of his further judgment, exercised within the limit imposed by the table, according to his assessment of the presence and degree of "overlap": it is not *necessarily,* as petitioner contends, the composite figure shown in the table. Any other interpretation would utterly refute the administratively pronounced status of the table as a "guide" to a "final rating" which "will be the result of consideration of the entire picture of disability and possibility of employability." (See the text of the multiple disability formula as quoted in fn. 8, *ante.*)

plus 10% of the rating for the secondary disability. . . . Final rating may not exceed 100%. *The table on the following page can be used instead of performing the computation in each individual case.*

"The result obtained by such calculation is not necessarily to be adopted as the final rating for combined disabilities but should serve as a guide only. The final rating will be the result of consideration of the entire picture of disability and possibility of employability." (Italics added.)

A more literal interpretation may be placed upon the *Hegglin* court's conjunctive—but distinct—statement that ". . . the pyramiding of disabilities is properly avoided . . . by application of the multiple disabilities rating schedule" to separately described factors of permanent disability caused by a single industrial accident. (*Hegglin* v. *Workmen's Comp. App. Bd., supra,* 4 Cal.3d 162 at p. 174.) It is arithmetically possible that the sum of the factors' separate ratings might "pyramid" beyond 100 percent, which is obviously impermissible where they have been caused by one accident. (Lab. Code, § 4658; CEB, § 15.25. See, and compare, *Pacific Gas & Elec. Co.* v. *Ind. Acc. Com.* (1954) 126 Cal.App.2d 554, 556-557 [272 P.2d 818] [successive accidents producing a cumulative "rating" of 102½ percent]. See also *Smith* v. *Industrial Acc. Com.* (1955) 44 Cal.2d 364, 367-368 [282 P.2d 64].) This possibility is "avoided . . . by application of the multiple disabilities rating schedule" because the table thereof does not permit a composite rating in excess of 100 percent.

Our interpretation of the *Hegglin* language disposes of petitioner's complaint of the fact, which the second referee mentioned in his report to the Board (quoted *ante*), that the specialist in this case had not read *Hegglin* and had received no instructions from the Bureau concerning its application to his work. The fact need not be deemed remarkable, and it is in no event significant: the mandate of the *Hegglin* language is addressed to the Board or referee who requests a Bureau rating, not to the Bureau or specialist who responds with one. (*Hegglin* v. *Workmen's Comp. App. Bd., supra,* 4 Cal.3d 162 at pp. 172, 174.)

Two further factors should be mentioned. One is that the multiple disabilities rating schedule itself did not become part of the master schedule, as such, until the administrative director amended the latter in 1973. It had theretofore appeared in a "Supplement" of the master schedule under a legend stating that "[t]he information appearing in this Supplement is for general guidance only and is not an integral part of the [master] schedule." (Form 302 [1966 ed.] pp. 75, 81-82.) The 1973 amendment, adopted by the administrative director pursuant to Labor Code section 4660, subdivision (b) (quoted in fn. 7, *ante*), effected the "transfer" of the multiple disabilities rating schedule into the master schedule so that it became an "integral part" thereof, but only as to "injuries occurring on or after January 1, 1970." (Form 302 [1966 ed.] p. 75; *id.,* [1973 amend.] pp. 1-A, 81. See Lab. Code, § 4660, subd. (c), quoted in fn. 7, *ante.*) Although the 1973 amendment did not reach petitioner explicitly, because he was injured in 1969, the multiple

disabilities rating schedule was a proper "guide" in the 1974 rating process because its provisions were of record "for general guidance" at all pertinent times since 1966.

The other factor to be mentioned is the testimony of the rating specialist that "[t]here might be some overlap; however, I think there are two distinct areas of disability here." (See fn. 4, *ante.*) Read by itself, the statement is somewhat ambiguous as to the presence, absence, or degree of "overlap." In its full context, however, he had testified to his "opinion" that petitioner's "overall disability" was to be rated at a "sedentary or 70% standard." (See *ibid.*) The context necessarily indicates that he had found "overlap" and assessed its degree: this having been the critical finding, the ambiguity of his testimonial statement does not qualify or impeach it.

We have thus seen that the expert judgment of the specialist controlled in the rating process, that the multiple disabilities rating schedule served in it as a "guide" and not a source, and that *Hegglin* does not dictate to the contrary as petitioner contends. The Board was therefore correct in its determinations, stated in the opinion and decision under review, that there was "evidence to support a rating of no less than 69%" (the higher of the two separate ratings which the specialist had reached) "and no more than 92%" (the ceiling imposed by the multiple disabilities rating schedule); and that his "opinion" was "well within the range of evidence available to him." It follows that the opinion and decision are supported by substantial evidence.

Respondent Board's "Opinion And Decision After Reconsideration" is affirmed.

Christian, J., and Emerson, J.,* concurred.

A petition for a rehearing was denied March 25, 1976, and petitioner's application for a hearing by the Supreme Court was denied April 22, 1976.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.