[Civ. No. 54092. Second Dist., Div. Five. Dec. 24, 1979.]

GREGORY ROBERT ALIANO, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD,
CANOGA CHRYSLER-PLYMOUTH, INC., et al., Respondents.

[Civ. No. 54095. Second Dist., Div. Five. Dec. 24, 1979.]

CANOGA CHRYSLER-PLYMOUTH, INC., et al., Petitioners, v.
WORKERS' COMPENSATION APPEALS BOARD and
GREGORY ROBERT ALIANO, Respondents.

**COUNSEL**

Robert Bovshow for Petitioner in No. 54092 and Respondent in No. 54095.

Clopton, Penny & Kenney and Robert M. Penny for Petitioners in No. 54095 and Respondent in No. 54092.

No appearance for Respondent Workers' Compensation Appeals Board.

**OPINION**

**STEPHENS, J.**—The matter herein involves proceedings before the Workers' Compensation Appeals Board (hereinafter WCAB), regarding the workers' compensation claim of Gregory Robert Aliano against his employer, Canoga Chrysler-Plymouth, Inc., (hereinafter Canoga) which was insured by Eldorado Insurance Company (hereinafter Eldorado). Both Aliano and Canoga/Eldorado assert error in the decision of the WCAB.

Aliano contends that the determination by the WCAB of his level of permanent disability resulting from the industrial injury is in error. Canoga/Eldorado contend that (1) the WCAB erred in granting Aliano's petition to reopen his claim, (2) the factors of psychiatric permanent disability as determined by the WCAB are erroneous as they fail to accurately reflect to what extent the alleged industrial condition is "labor disabling," (3) there are other errors in the manner in which the permanent disability was rated; and (4) the WCAB erred in not apportioning more of the permanent disability as not chargeable to Canoga/Eldorado.

We find that the decision of the WCAB to reopen Aliano's claim withstands attack by Canoga/Eldorado. The balance of Canoga/Eldorado's contentions are also rejected. Regarding Aliano's contention, the record reveals clear error by the WCAB in computing Aliano's permanent disability and we thus remand this issue to the WCAB for such further proceedings as are indicated by our opinion herein.

## I. PROCEEDINGS BEFORE THE WCAB

Aliano while employed on July 13, 1972, by Canoga as an automobile mechanic sustained injury arising out of and occurring in the course of said employment. The injury occurred when Aliano was working on an automobile which was raised on a hoist. Aliano dropped a wrench and bent over to pick it up. When he stood up, he hit the side of his head on one of the automobile tires.

In his original decision issued August 8, 1974, the workers' compensation judge (hereinafter WCJ) found that Aliano had sustained no permanent disability as a result of said injury and was not in need of further medical care for the industrial injury. In these original proceedings the WCJ concluded that Aliano's continued disability was not the result of the industrial injury but rather totally caused by nonindustrial viral encephalitis.

Subsequent to the WCJ's original decision, Aliano petitioned to reopen his claim. (Lab. Code,[1] §§ 5410, 5803, 5804.) In a decision issued March 23, 1978, the WCJ granted Aliano's petition to reopen, and reversing his original decision found that Aliano's continued disability was indeed related to the industrial injury and not to viral encephelitis. In the decision granting reopening, the WCJ awarded Aliano full workers' compensation benefits including temporary disability, permanent disability, reimbursement for self-procured medical treatment for the industrial injury, and further medical treatment to cure or relieve from the effects of said injury. The WCAB affirmed the WCJ's decision granting reopening with the exception of a purported error in the percentage of permanent disability.

Because of the importance of the procedural history of the case, we set forth separately in detail the record, including the medical history and evidence, *as it existed* before the WCJ at the time of his original

---

[1]Hereinafter, unless specified to the contrary, all references will be to the Labor Code.

decision and at the time of the decision granting reopening. Thus, we discuss the record pertaining to the original proceedings as it *actually existed* before the WCJ when he rendered his original decision and not as to documentary evidence produced subsequent thereto in conjunction with Aliano's petition to reopen.

## A. Original Proceedings Before the WCJ

The industrial injury occurred on Thursday, July 13, 1972. Aliano did not report the accident to any of his supervisors the day it occurred. He finished out the day's work and returned to work the next day.

The first medical care Aliano sought after the industrial injury was on Saturday, July 15, 1972, from his family physician, Leslie H. Wolfe, M.D. Dr. Wolfe's medical records, however, state Aliano had "persisting low back pain—palpable spasm of L-3/L-S. . ." but made no mention of any head trauma. Dr. Wolfe did, however, issue a report dated July 25, 1972, wherein he stated that he had first examined Aliano for the injury on July 18, 1972. In said report Dr. Wolfe described the injury as having occurred when Aliano "hit head on auto which was raised on the hoist. He walked right into it." Dr. Wolfe's diagnosis was "concussion with post concussion syndrome." Dr. Wolfe suggested a neurological examination.

When Aliano returned to work on Monday, July 17, 1972, he reported the injury to a supervisor at Canoga and stated that he felt severe pressure and pain in the back of his head. Canoga sent Aliano to the West Park Hospital. At West Park Hospital Aliano was examined by G. Bartosh, M.D., whose first report describes the accident as "Possible injury to neck. (headaches) hit it into car tire at work." Dr. Bartosh's initial diagnosis was "Concussion syndrome, severe headache."

At the referral of Dr. Wolfe and with the permission of Eldorado, Aliano was examined on July 18, 1972, by Marvin A. Korbin, M.D., a specialist in neurological surgery. Dr. Korbin recorded a history of complaints by Aliano "of severe headache and nausea since an injury at work on Thursday, July 13, 1972." Dr. Korbin's diagnostic impression was "(1) Postconcussion state. 2. No evidence of increasing intracranial pressure." Dr. Korbin recommended that Aliano "be hospitalized

for observation and other objective tests so that we might rule out the possibility of an internal hemorrhage." In accordance with this recommendation, Aliano was hospitalized at Northridge Hospital.

Dr. Korbin reported on July 28, 1972, that while at Northridge Hospital numerous tests were performed and "a lumbar puncture revealed a small number of white blood cells suggesting perhaps that he had had a mild encephalitis." Dr. Korbin observed that Aliano's "cause is very typical of that problem, particularly in that he had fever, headache, somnilence and vomiting." Dr. Korbin concluded: "[I]t seemed quite obvious that he had suffered injuries to his head more severe than the one that seemed to initiate his problem. ¶ I believe that after reviewing all of the history, hospitalization, laboratory reports and his course that this patient has suffered a case of mild viral encephalitis and is improving."

In a follow-up report of August 4, 1972, Dr. Korbin reported that Aliano "seems to be improving from his recent bout of what we assume to be a mild viral encephalitis."

Gilbert Saliba, M.D., performed a consultative evaluation of Aliano at Northridge Hospital on August 8, 1972. In his report, dictated on August 10, 1972, Dr. Saliba stated in pertinent part:

"DIAGNOSTIC IMPRESSION:

"1. Viral encephalitis, probably equinencephalitis or enteroviral infection. Rule out post infectious encephalitis, rule out herpes simplex, encephalitis.

"Doubt collagen disease, amoebic meningoencephalitis or leptospirosis.

"2. Inappropriate ADA secretion due to encephalitis.

"3. History [four years prior] of fibroma, left 10th rib, post resection."

RECOMMENDATIONS DIAGNOSTIC: Acute and convalescent serum to State Lab for viral encephalitis studies. Also would send CSF and stool for viral study, if the lab can properly handle and transport these speciments. L.E. Prep, times two and ANA. Leptospiral agglutinins."

Dr. Korbin after a re-examination on October 20, 1972, reported that Aliano "noted that his headache was somewhat more severe and he complains of dizziness, loss of coordination and some neck discomfort." Dr. Korbin, somewhat perplexed by Aliano's continued problems, stated in his report: "I could find no evidence of increasing intracranial pressure nor of neurological deficit to suggest a mass lesion. ¶ I have assumed that his problem has been secondary to a viral encephalopathy but I cannot understand the long duration. Consequently, it may be necessary to consider re-hospitalization for other objective tests if he is not markedly improved in the near future."

On November 22, 1972, Aliano was examined by Ernest E. Parks, M.D. and Deward W. Jones, M.D. at the Santa Fe Memorial Hospital.

Dr. Parks in his report of November 27, 1972, stated that Aliano's condition was compatible with "right occipital neuralgia" but observed that a review of Aliano's past medical records was imperative as there was the question of encephalitis which would be unrelated to the industrial injury. Thus, Dr. Parks was, in his words, "rather inconclusive" but stated that Eldorado had advised him the prior records would be provided to him. Dr. Parks, however, issued no supplemental reports and thus there is no indication Dr. Parks ever reviewed the prior medical records.

Dr. Jones' report of November 25, 1972, is equally equivocal as that of Dr. Parks. While Dr. Jones agreed with Dr. Parks that viral encephalitis would be unrelated to the industrial injury, he actually rendered no opinion on whether Aliano had viral encephalitis. In this regard, all Dr. Jones stated was as follows: "*If this man's diagnosis of encephalitis was confirmed by his Northridge Hospital studies* his condition the past several months has been residual from that disorder and his problem is in no way related to his work. Encephalitis is an infection unrelated to trauma and in this case was attributed to a viral infection and was seemingly confirmed by appropriate laboratory tests and studies. [¶] The man's minor head injury of July 1972 comprised no concussion or brain injury and there was no loss of consciousness. In fact he continued working that day and it was the following day that he developed chills, fever, general body aches and headaches that evolved into the encephalitic syndrome. [¶] Currently the man is much improved, had gotten over his depression, suicide efforts and illness but has the old left chest hyperesthesia and the chronic low back syndrome which date back several years. He has a right occipital neuralgia which should respond to

nerve blocks but this is related to his encephalitic illness and is not your concern. His private physician might wish to do an air study but it is not essential that it be done now." (Italics added.)

In 1974 Aliano went to the UCLA School of Medicine, Department of Neurology, for further evaluation which was performed by Robert Baloh, M.D. Dr. Baloh was unable to render a conclusive opinion on whether Aliano's continued complaints were the result of nonindustrial viral encephalitis rather than the industrial injury. In his report dated April 15, 1974, Dr. Baloh stated: "I don't believe it will be possible at this time to be certain whether [Aliano's] symptoms are all the result of a contusion to the brain as the result of his head injury or the coincidental onset of an acute viral encephalitis at the same time with subsequent clearing. His residual symptoms of persistent headaches, emotional instability, left arm pain and mental confusion could all be a result of damage from either of these two conditions."

Canoga/Eldorado had initially accepted that Aliano's continued disability was the result of the industrial injury; however, they later terminated benefits upon the ground that Alaiano's disability was nonindustrial.

It was upon this record that the matter came for hearing before the WCJ on June 14, 1974. Stipulations and issues were framed, the above medical reports and records were received into evidence, and the matter submitted for decision without Aliano or any other witnesses testifying. Among the issues were whether Aliano had sustained injury arising out of and occurring in the course of employment, extent of permanent disability, and need for further medical treatment.

In the decision rendered August 8, 1974, the WCJ found Aliano had "sustained an injury arising out of and occurring in the course of his employment to his head." The WCJ found, however, that Aliano was not then disabled as the result of the industrial injury but rather as the result of the nonindustrial viral encephalitis. The WCJ accordingly refused to award Aliano any permanent disability or further medical care for the industrial injury.[2]

[2]The WCJ stated in his "Opinion on Decision": "Applicant sustained no permanent disability as a result of injury herein.

"The only complete histories of this problem are contained in the Record of Consultation written by Gilbert Saliba, M.D. on August 8, 1972 and Deward W. Jones, M.D. in his report of November 25, 1972. It appears that applicant had developed a flu-like syndrome and while so suffering, had bumped his head against a tire. Applicant was

Eldorado sought reconsideration (see § 5900, subd. (a)) by the WCAB within the 20-day period specified in Labor Code section 5903. Aliano did not seek reconsideration within the 20-day period specified in section 5903. The WCAB denied Canoga/Eldorado's petition for reconsideration by order dated September 25, 1974.[3] Canoga/Eldorado did not then seek a writ of review (§§ 5950-5956.) This aspect of the WCJ's original decision has thus long since become final.

B. Petition by Aliano for WCAB to Grant
 Reconsideration on Its Own Motion or
 Grant Reopening

On October 7, 1974, more than 20 days after the findings and award of August 8, 1974, Aliano filed with the WCAB a "Petition for Reconsideration on Appeals Board's Own Motion and Alternatively Petition to Reopen." At this time, Aliano was represented by a new counsel.

In this petition Aliano argued that certain medical reports, which Aliano contended were material, had not been introduced into evidence by his prior counsel. Aliano argued that had these reports been admitted into evidence and had they been shown to the physician on whom the workers' compensation judge relied, it would have been evident that Aliano had sustained permanent disability and required further medical treatment as a result of the industrial injury. Aliano alleged that his prior counsel had been inadequate, pointing out that among other things he had not even allowed him to testify in this matter.

not unconscious and continued to work the balance of the day. That night or the following day, he began to suffer complaints of headaches, nausea, fever, etc. He was hospitalized and a diagnosis of viral encephalitis was made. Drs. Korbin, Parks and Jones opined that applicant's problem was not in any way related to the head injury at work but to the encephalitis which is an infection unrelated to trauma.

"Robert Baloh, M.D. examined applicant on two occasions in April 1974. In between the examinations, the doctor received applicant's previous records. Just what records were reviewed is not shown. Upon questioning, applicant informed him that all the symptoms came on right after the head injury. This is contrary to the statements made to Dr. Saliba on August 8, 1972 and Dr. Jones in November 1972, times when his memory was much fresher than in April 1974. Based partially on this erroneous history, Dr. Baloh was unable to determine whether applicant's complaints were due to the injury or the encephalitis.

"The reports of Drs. Saliba and Jones were more persuasive than those of Dr. Baloh."

[3]Canoga/Eldorado's petition for reconsideration sought review of that portion of the WCJ's decision which held Eldorado liable for certain medical care provided to Aliano prior to the original decision. The WCJ held Eldorado liable for such medical care and evaluation on the grounds that Eldorado had authorized it even though the condition was later proven to be nonindustrial.

Attached to Aliano's petition to the WCAB were the results of laboratory tests done at Northridge Hospital. The two lab test reports were dated August 11, 1972 and August 15, 1972, and indicated negative results for virus and for encephalitis.[4] These lab reports had not been offered into evidence at the time of the original proceedings. Also attached to the petition was a neurological report from Roger K. Woods, M.D., dated May 1, 1973, which Aliano in the petition alleged he had given to prior counsel before the June 14, 1974, hearing but which prior counsel had failed to file with the WCJ[5] and offer into evidence.

Dr. Woods stated in his report addressed to Henry Jones, M.D.: "[Aliano] gives history of several complaints which I think are not related one to the other and must be treated separately.

"I. He has history of headaches dating back to a head injury in July of 1972: EEGs initially following this are reported to show some mild or borderline abnormality and spinal fluid examination in July and August show slight cellular reaction, consistent with a viral encephalitis. This is so slight that it probably does not account for his headaches or other symptoms. Nonetheless, repeat lumbar puncture should be performed. Also, because his most recent brain scan in November is said to show some early abnormality, I think repeat cerebral flow study and brain scan should be performed as well as repeat skull X-rays and EEG at this time. Arrangements will be made for these to be carried out as an out patient, intially the X-rays, brain scan and EEG. If these are normal, I will proceed with a lumbar puncture. His headaches initially may have been related to head injury, but certainly the course of his headaches of worsening or failure to significantly improve with the passage of time is against I think post head injury or post concussion syndrome.

---

[4]The lab report of August 15, 1972 states: "Spinal fluid for viral studies: no virus isolated. Stool for viral studies: no virus isolated."

The lab report of August 11, 1972 states: "Coxsackie Virus Studies:

| "Test | Acute | Interpretation | Convalescent | Interpretation |
|---|---|---|---|---|
| Herpes Simplex | <1:14 | Negative | 1:4 | past infection |
| "Mumps | 1:8 | Past infection | 1:8 | past infection |
| "Western Equine Encephalitis | <1:4 | Negative | <1:4 | Negative |
| "St. Louis Encephalitis | <1:4 | Negative | <1:4 | Negative |
| "Coxsackie | <1:4 | Negative | <1:4 | Negative." |

[5]Failure of counsel to file such report with the appeals board and serve a copy upon Canoga/Eldorado is in violation of the WCAB Rules of Practice and Procedure. (Cal. Admin. Code, tit. 8, ch. 4.5, subch. 2, §§ 10608, 10615, 10622.)

The question must arise as to what degree these may be psychologically initiated or at least perpetuated, and if the repeat studies indicated are all entirely normal, formal psychiatric consultation will be suggested.

"II. He gives history of recurrent neck and back pain though at the present I am unable to feel any significant muscular tightness in association with these and his X-rays fail to show reversal of normal curvature or other changes. I do not see any evidence of radicolopathy in either upper extremity. In the left lower extremity there may be as mentioned slight weakness of the hamstrings and dorsiflexion of the left great toe which might suggest some complicating radiculopathy. Nonetheless, I would choose to leave these matters in your hands; certainly if they are to be pursued, EMG examination would seem in order. ¶ The patient will contact my office approximately three days after his repeat brain scan and EEG and skull films and again, if these are normal, arrangements will be made for a lumbar puncture."

Aliano's petition[6] requested relief from the WCAB relying upon section 5803[7] and section 5900, subdivision (b).[8]

---

[6]Aliano's counsel who filed the petition with the WCAB filed a substitution of attorneys with the WCAB on September 18, 1974, which he had received from the prior attorney on September 13, 1974. The prior attorney had filed no answer to Canoga/Eldorado's petition for reconsideration; new counsel found time too short to file a proper answer to Canoga/Eldorado's petition for reconsideration.

[7]Section 5803: "The appeals board has continuing jurisdiction over all its orders, decisions, and awards made and entered under the provisions of this division. At any time, upon notice and after an opportunity to be heard is given to the parties in interest, the appeals board may rescind, alter, or amend any such order, decision, or award, good cause appearing therefor. [¶] Such power includes the right to review grant or regrant, diminish, increase or terminate, within the limits prescribed by this division, any compensation awarded, upon the grounds that the disability of the person in whose favor such award was made has either recurred, increased, diminished, or terminated."

Section 5804: "No award of compensation shall be rescinded, altered, or amended after five years from the date of the injury except upon a petition by a party in interest filed within such five years and any counterpetition seeking other relief filed by the adverse party within 30 days of the original petition raising issues in addition to those raised by such original petition. Provided, however, that after an award has been made finding that there was employment and the time to petition for a rehearing or reconsideration or review has expired or such petition if made has been determined, the appeals board upon a petition to reopen shall not have the power to find that there was no employment."

Section 5805: "Any order, decision, or award rescinding, altering or amending a prior order, decision, or award shall have the effect herein provided for original orders, decisions, and awards."

[8]Section 5900: "(a) Any person aggrieved directly or indirectly by any final order, decision, or award made and filed by the appeals board or a referee under any provision contained in this division, may petition the appeals board for reconsideration in

On November 21, 1974, the WCAB issued an opinion and order denying reconsideration which refused to grant Aliano's petition for reconsideration pursuant to section 5900, subdivision (b) (as opposed to Aliano's petition to reopen under § 5803). The WCAB noted that 60 days had passed since the WCJ's findings and award of August 8, 1974, and accordingly it no longer had power to grant reconsideration on its own motion. (See § 5900, subd. (b); *United States Pipe & Foundry Co. v. Industrial Acc. Com.* (1962) 201 Cal.App.2d 545, 548-549 [20 Cal.Rptr. 395]; 1 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d rev. ed. 1979) § 7.03 [4], pp. 7-23 to 7-24.) The WCAB indicated, however, that the "Petition to Reopen" could be considered at the trial level and returned the matter to the WCJ for further proceedings and decision on the petition to reopen.

## C. Proceedings Before the WCJ on the Petition to Reopen

### 1. Evidence on Petition to Reopen

In regard to the petition to reopen both Aliano and Canoga/Eldorado offered additional medical evidence.

Predating the hearing of June 14, 1974, were the medical records, including reports, of Northridge Hospital, Santa Fe Hospital, Leslie

---

respect to any matters determined or covered by the final order, decision, or award, and specified in the petition for reconsideration. Such petition shall be made only within the time and in the manner specified in this chapter. [¶] (b) At any time within 60 days after the filing of an order, decision, or award made by a referee and the accompanying report, the appeals board may, on its own motion, grant reconsideration."

Section 5903: "At any time within 20 days after the service of any final order, decision, or award made and filed by the appeals board or a referee granting or denying compensation, or arising out of or incidental thereto, any person aggrieved thereby may petition for reconsideration upon one or more of the following grounds and no other: [¶] (a) That by such order, decision, or award made and filed by the appeals board or referee, the appeals board acted without or in excess of its powers. [¶] (b) That the order, decision, or award was procured by fraud. [¶] (c) That the evidence does not justify the findings of fact. [¶] (d) That the petitioner has discovered new evidence material to him, which he could not, with reasonable diligence, have discovered and produced at the hearing. [¶] (e) That the findings of fact do not support the order, decision, or award. [¶] Nothing contained in this section shall limit the grant of continuing jurisdiction contained in Sections 5803 to 5805 inclusive."

Section 5904: "The petitioner for reconsideration shall be deemed to have finally waived all objections, irregularities, and illegalities concerning the matter upon which the reconsideration is sought other than those set forth in the petition for reconsideration."

Wolfe, M.D., Roger K. Woods, M.D., and Henry Jones, M.D. With the exception of limited portions of the records of Northridge Hospital and Santa Fe Hospital, these records and reports had not been in evidence at the time of the original decision. Of significance besides the Northridge Hospital laboratory reports and the May 1, 1973 report of Dr. Woods, is Dr. Woods' supplemental report of January 15, 1974.

In a report to another physician dated January 15, 1974, Dr. Woods discloses that skull X-rays, and EEG, a brain scan, and a spinal fluid examination were performed in May 1973 at St. John's Hospital and revealed normal findings. Dr. Woods further reports that in June 1973 he advised Aliano of Dr. Woods' "suspicion that the nature of his problems may well be psychological rather than organic." Dr. Woods then goes on to advise that Aliano failed to follow up and make arrangements for psychological testing as recommended by Dr. Woods.

Arguably of note in the Northridge Hospital records is a report by Leonard B. Skaist, M.D., wherein Dr. Skaist, on August 17, 1972, reports that "while recovering from a viral encephalitis" Aliano noted the presence of hematuria (blood in the urine) and peculiar growths in the groin area. Dr. Skaist opined these lesions which were consistent with candylomata acuminata, benign lesions secondary to viral agents. Treatment was deferred by Dr. Skaist until Aliano recovered from his "neurological infection." Dr. Skaist, however, did not indicate this particular problem was related to viral encephalitis.

Those portions of the above medical records which predated Aliano's industrial injury are also relevant.

Dr. Wolfe's records reveal: Aliano sustained an automobile accident in 1964 in which he injured his neck and upper back; Dr. Wolfe in 1965 reported that he had treated Aliano for nervous headaches since 1962; and in February 1970 Aliano was in an automobile accident and as a result had complaints of pain in the chest, lower back, neck and fingers of the left hand.

Regarding the 1970 automobile accident Dr. Wolfe referred Aliano to Andrea Cracchiolo III, M.D., an assistant professor of orthopedic surgery at the UCLA school of medicine. Dr. Cracchiolo examined Aliano on July 20, 1970, and at that time noted that "he complained of malaise, considerable irritability, general chronic persistent low back

pain which occasionally radiated down the posterior left lower extremity" and "also complained of some posterior neck pain which occasionally radiated into the occiput." Dr. Cracchiolo suggested conservative medical care and did not believe Aliano was a candidate for any surgical procedures.

Of interest with regard to the 1970 automobile accident was that Aliano's deposition was taken in connection therewith in February 1973. Thereat Aliano acknowledged he continued to have back and neck problems from the 1970 accident and continued to receive care therefor from Dr. Wolfe. Also Aliano admitted because of back problems from the 1970 accident he had changed jobs to find lighter work.

Dr. Seymour Gassner, M.D., also evaluated Aliano in 1971 at the referral of Dr. Wolfe. In his report of August 12, 1971, Dr. Gassner recorded that Aliano gave a history of "having low back pain on and off" for four to five years. Dr. Gassner's medical impression was that Aliano had an "[u]nstable low back secondary to degenerative disc disease of L5-S1." The treatment recommended by Dr. Gassner was continued conservative medical care but if that was unsuccessful "then the most reasonable solution remaining would be a lumbosacral fusion."

In connection with his petition to reopen, Aliano sought several new medical opinions. He obtained a neurological evaluation from Robert A. Rose, M.D., who examined Aliano on January 20, 1975. In his report of March 8, 1975, Dr. Rose's diagnoses were "1. Cerebral contusion; 2. Status post-cerebral concussion syndrome; 3. Post-traumatic headache; 4. Radiculopathy C-6/C-7 on the left, probably on the basis of ruptured neuclus of the disc at C-5/C-6; 5. Occipital neuritis; 6. Post-traumatic anxiety neurosis." Dr. Rose opined that in light of the negative laboratory test results and Aliano's medical history there were insufficient medical data to have ever justified a diagnosis of viral encephalitis. In Dr. Rose's opinion Aliano's problems were rather caused by the head trauma of the industrial injury.

After again changing attorneys to his present counsel, Aliano obtained another neurological evaluation from Zdenek J. Sladky, M.D. Dr. Sladky's diagnoses as stated in his report of September 24, 1975, were:

"1. Cerebral concussion-contusion, moderate, 1972.

"2. Cervical sprain with radiculopathy, C8-T1 on the left, 1970, 1972.

"3. Lumbosacral sprain with radiculopathy, L4-5-S1 on the left, 1970.

"4. Reactive depressive neurosis."

Dr. Sladky was of the opinion that the laboratory tests failed to confirm the diagnosis of any type of encephalitis but rather indicated Aliano sustained a cerebral trauma to the occipital lobe as a result of the 1972 industrial injury. Dr. Sladky apportioned Aliano's neck condition as 25 percent related to a prior injury in 1970 and 75 percent related to the 1972 industrial injury. Any low back disability was attributed by Dr. Sladky to the 1970 injury. As to the psychiatric problems, Dr. Sladky deferred to psychiatric evaluations.

Aliano also obtained psychiatric evaluations from Vera Wayman, M.D. and Sam C. Gould, M.D.

Dr. Wayman's diagnosis, as stated in her report of May 29, 1975, was "reactive agitated depression." Dr. Wayman opined that Aliano's prognosis was "guarded" as Aliano was "probably chronic and has a moderate psychiatric disability from the psychiatric standpoint."

Dr. Gould performed a psychiatric evaluation of Aliano on July 22 and 30, 1975, and issued a report thereof on July 30, 1975. Dr. Gould opined Aliano was "suffering from a depressive neurosis manifested by symptoms of depression, anxiety, increased irritability with loss of temper control, insomnia, worries about his physical condition, and worries about his future." Dr. Gould observed that Aliano's depressive neurosis was not present prior to his injury on July 13, 1972. He concluded that the depressive neurosis was caused by the industrial injury; in that "Were it not for that [industrial] injury, [Aliano] would not now be suffering from it." The neurosis was viewed then at a moderate level of intensity but not yet "permanent and stationary."[9] Dr. Gould recommended Aliano receive immediate psychiatric treatment.

[9]WCAB Rules of Practice and Procedure (Cal. Admin. Code, tit. 8, ch. 4.5, subch.2) section 10900 provides: "Permanent Disability. A disability is considered permanent after the employee has reached maximum improvement, or his condition has been stationary for a reasonable period of time, as may be determined by the Appeals Board or a referee."
(See *Bstandig* v. *Workers' Comp. Appeals Bd.* (1977) 68 Cal.App.3d 988, 995-996 [137 Cal.Rptr. 713].)

Dr. Gould also diagnosed Aliano to be "suffering from a post-traumatic head syndrome manifested by symptoms of head pain, neck pain, and increased irritability." Dr. Gould noted the dispute in the medical record as to whether Aliano was suffering from encephalitis or a post-concussion syndrome. Dr. Gould's opinion was the latter, but he deferred to a neurologist to "help clear up this matter." Dr. Gould opined that the postconcussion syndrome was "permanent and stationary" and "at a slight to moderate level of intensity."

As Eldorado refused to provide the psychiatric care suggested by Dr. Gould, Aliano self-procured such care. In a supplemental report dated December 15, 1975, Dr. Gould indicated that he had provided Aliano with psychiatric care and that now Aliano's depressive neurosis was "permanent and stationary." Dr. Gould described the permanent psychiatric disability as a "depressive neurosis...in the slight to moderate range." Dr. Gould, however, also stated that Aliano would need lifetime access to psychiatric care.

Aliano obtained a medical evaluation from Paul Leonard, M.D., a specialist in physical medicine and rehabilitation. In his report of August 5, 1975, Dr. Leonard unequivocally stated that the "diagnosis of viral encephalitis was not adequately or properly established but an assumption was made which became fact by repetition." Dr. Leonard related "the deterioration of [Aliano's] status...to functional or anxiety factors." Dr. Leonard stated that all of Aliano's neck and head complaints were directly related to the industrial injury. As estimated by Dr. Leonard, as a result of his cervical complaints (in the "slight to less-than moderate range" with radiation into the left arm) Aliano suffered a 50 percent reduction in his overall work capacity.

Eldorado obtained a psychiatric evaluation of Aliano from S. J. Conrad, M.D. In his reports of July 3, 1975 and September 26, 1975, Dr. Conrad stated that Aliano neither sustained any neuropsychiatric condition as the result of the industrial injury nor was he psychiatrically disabled.

2. Decision of WCJ on Petition to Reopen

After the supplementary hearings on the petition to reopen whereat Aliano testified, the WCJ issued the following permanent disability rating instructions, which were referred to the Disability Evaluation Bureau for evaluation:

"Slight to moderate neurosis.

"Constant slight to less than moderate pain in neck.

"Apportion 50% of neck disability only to this case."

Based upon the WCJ's above factors of disability, the disability evaluation specialist (hereinafter rater)[10] recommended a 50½ percent permanent disability rating.[11] In calculating this rating the rater assigned a 39½ percent rating to the "neurosis." This was based on a 35 standard rating which was adjusted upward to 39½ percent for age and occupation. (See § 4660.) As to the neck disability, rater assigned a 30 standard rating which adjusted before apportionment to 31½ percent, which after apportionment became 15¾ percent. By application of the multiple disability table contained in the permanent disability rating schedule, the rating on the neurosis and the neck was combined to a final rating of 50½ percent.

Upon cross-examination of the rater, the parties explored the basis of his computations. On the neck disability, the rater stated that he assigned a 30 percent standard as such was the midpoint between "constant slight," a 10 percent standard rating, and "constant moderate," a 50 percent standard rating. In doing so, the rater admitted that he treated the WCJ's instruction that the upper level of the neck pain was "less than moderate," the same as an instruction of "moderate pain." In his opinion "less than moderate" was still within the range of "moderate."

As to the neurosis, the rater indicated that he had come to a 35 standard rating as it was at midpoint between a "slight neurosis," a 20 standard rating, and a "moderate neurosis," which is a 50 standard rating. The rater, however, was unable to describe precisely how such a

---

[10]The Disability Evaluation Bureau was formerly called the Permanent Disability Rating Bureau. Raters were formerly called permanent disability rating specialists, (1 Herlick, Cal. Workers' Compensation Law Handbook (2d ed. 1978) § 1.14, pp. 22-23.)

[11]A permanent disability rating of 50½ percent at Aliano's compensation rate amounts to 244.5 weeks of payment at $70 per week for a total of $17,115. (§§ 4453, 4658.)

neurosis would affect Aliano's ability to work.[12] The rater also acknowledged that if the neck pain was partially psychosomatic, in that it was a result of the neurosis, or if the neurosis was partially caused by the continuing neck pain, there would be duplication of some of the factors of disability.

On March 23, 1978, the WCJ issued his "Order Granting Petition to Reopen and Decision Thereon." Therein, the WCJ judge granted Aliano's petition to reopen and found that Aliano's "condition was worsened, resulting in permanent disability." The WCJ awarded Aliano temporary disability, medical treatment, and permanent disability in the amount of 50½ percent.

D. Decision of WCAB on Reconsideration of
 Decision Granting Reopening

Canoga/Eldorado sought reconsideration by the WCAB of the WCJ's decision. In its petition for reconsideration, they contended: (1) No good cause to reopen exists; (2) the evidence did not establish that Aliano's condition had worsened since the original decision; (3) there was error in the apportionment to the pre-existing disability, (4) the factors of permanent disability were incorrectly stated, and (5) the workers' compensation judge failed to comply with section 5313 and specify the evidence relied upon and state the reasons for his decision.

The WCJ responded to Canoga/Eldorado's petition for reconsideration by written report as required by WCAB Rules of Practice and Procedure (Cal. Admin. Code, tit. 8, ch. 4.5, subch. 2) section 10860. The WCJ in his report asserted he had committed no error except with regard to the permanent disability rating for the neurosis. The WCJ advised the WCAB that the rater had testified that he had rated the neurosis based upon the midway point between a "very slight" neurosis, which is a 10 percent standard, and a "moderate" neurosis, a 50 percent standard, and used a 35 standard. The WCJ observed that midway between a 10 standard and a 50 standard was a 30 standard and therefore recommended that the rating should be adjusted by reducing it by 5

---

[12]The rater was unable to state what specific duties an individual with a slight to moderate neurosis either could not perform or would be handicapped in performing.

When asked whether a person with a moderate neurosis might be fully capable of competing in the open labor market, the rater responded: "By definition that a moderate neurosis would constitute a moderate psychological handicap, then I would say that from a practical standpoint...a person with a moderate neurosis would not be fully capable of competing in the open labor market."

percent to 45½ percent permanent disability. The WCJ based this analysis on his "summary of evidence" (WCAB Rules of Practice and Procedure (hereinafter WCAB Rules) section 10586, which was incorrect; the rater, as noted above, testified that he utitlized a 35 percent standard for the "slight to moderate" neurosis as "35" was the midpoint between "slight," a 20 standard, and "moderate," a 50 standard. Unfortunately, neither party pointed this error out to the WCAB, but rather assumed the WCJ's summary of evidence was correct.

On reconsideration the WCAB followed the WCJ's recommendation on the correction of the permanent disability rating; thus, reducing the overall permanent disability rating to 45½ percent.[13] The WCAB rejected all of Canoga/Eldorado's other contentions.

## II CONTENTIONS ON WRIT OF REVIEW

A. Contentions of Canoga/Eldorado

Canoga/Eldorado contend:

1. The granting of the petition to reopen was in error in that,

(a) it is improper to grant a petition to reopen merely because of a change in opinion by the WCJ and the WCAB,

(b) there is no substantial evidence that the original decision finding Aliano to be suffering from viral encephalitis is in error,

(c) there is no substantial evidence supporting a finding that Aliano has any "new and further disability" which would justify a petition to reopen, and,

(d) a petition to reopen may not be utilized, as here, in lieu of the failure to timely file for reconsideration.

2. The original decision found injury to the "head" only and it is error to now award disability to the neck.

3. The disability rating for the neck disability is in error as the rater treated as meaning merely "moderate" that portion of WCJ's rating

---

[13]A 45½ percent permanent disability rating for Aliano provides him with 213.75 weekly payments at $70 each for a total of $14,962.50.

instructions which classified the upper range of subjective complaints of pain as "less than moderate."

4. The description of Aliano's permanent disability from the alleged industrial neurosis as "slight to moderate" is improper as such permanent disability factors fail to reflect the level of work disablement.

5. The factors of permanent disability as determined by the WCJ failed to reflect that the neck disability may merely be a manifestation of Aliano's neurosis or the neck disability may be an aggravating factor of the neurosis.

6. There is a failure to apportion to Aliano's preexisting emotional and back disability.

**B. Contentions of Aliano**

Aliano contends simply that the WCAB erred in reducing his permanent disability rating by 5 percent disability to 45½ percent permanent disability.

### III. DISCUSSION

**A. The WCAB Did Not Err in Granting the Petition to Reopen**

Had all the presently available evidence been before the WCJ at the time he rendered his original decision, there is no question that the WCJ would have found in favor of Aliano (as he did in granting the petition to reopen) and that the WCAB would have affirmed such a decision. Such a decision would not have been subject to successful attack as it would have been supported by substantial evidence in light of the entire record. (§ 5952, subd. (d); *LeVesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627 [83 Cal.Rptr. 208, 463 P.2d 432].)

We are not here reviewing the original decision, which has long since become final. (§ 5950.) Also not before this court for review is the WCAB's denial of reconsideration on its own motion pursuant to section 5900, subdivision (b), which has similarly long since become final. All that is before this court for review is the WCAB's affirmance of the

WCJ's decision granting reopening pursuant to sections 5410, 5803 and 5804.[14] "Accordingly, the record of the original proceeding is not now before us for review as to the correctness thereof. That record may, however, be reviewed together with other matters in the present proceedings to determine whether there is good cause to reopen and our decision will be so limited." (*Walters* v. *Industrial Acc. Com.* (1962) 57 Cal.2d 387, 393 [20 Cal.Rptr. 7, 369 P.2d 703]; *Clendaniel* v. *Ind. Acc. Com.* (1941) 17 Cal.2d 659, 662 [111 P.2d 314].)

■ At the outset we observe that sections 5410, 5803 and 5804 permit reopening of a case, within the limits set forth below, upon a petition to reopen filed within five years of the date of injury. While the WCJ's decision granting reopening here issued more than five years after the injury, the WCJ still had jurisdiction to render his decision as Aliano had filed his petition to reopen within five years of the date of injury. (1 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d rev. ed., 1979) § 9.02 [3].)[15]

■ The WCAB upheld the granting of the petition to reopen on the grounds that Aliano had sustained "new and further disability" (§ 5410) and that there was "good cause" to reopen in that the original decision was inequitable (§§ 5803-5805).

---

[14]By referring the petition to reopen back to the WCJ, the WCAB did not rule on the merits thereof. While the WCAB could have itself conducted hearings on the petition to reopen, the customary procedure is for the WCJ initially to hear such matters. Herein we utilize the term "appeal board" to refer to either the WCAB or the WCJ.

[15]Section 5410 permits the reopening of a prior decision of the WCAB for "new and further disability" upon the filing of a petition of the injured employee within five years of the date of injury. (*Nolan* v. *Workers' Comp. Appeals Bd.* (1977) 70 Cal.App.3d 122 [138 Cal.Rptr. 561]; see generally, 1 Hanna, *op. cit. supra,* §§ 9.01-9.03; 1 Herlick, Cal. Workers' Compensation Law Handbook (2d ed. 1978) §§ 14.5-14.9; Cal. Workmen's Compensation Practice (Cont.Ed.Bar 1973) §§ 4.19, 12.4-12.14; Mastoris, *The Statutes of Limitation in Workers' Compensation Proceedings* (1979) 15 Cal. Western L.Rev. 32, 61-65, 67-74 (hereinafter Mastoris, *op. cit, supra,* 15 Cal. Western L.Rev. 32); see also, *Standard Rectifier Corp.* v. *Workmen's Comp. App. Bd.* (1966) 65 Cal.2d 287, 290 [54 Cal.Rptr. 100, 419 P.2d 164]; *Pizza Hut of San Diego, Inc.* v. *Workers' Comp. Appeal Bd.* (1978) 76 Cal.App.3d 818, 822 [143 Cal.Rptr. 131].) Sections 5803-5805 permit the reopening of a previously adjudicated case for "good cause" upon a petition filed by a party in interest within five years from the date of injury. (1 Hanna, *op. cit. supra,* § 9.02; Mastoris, *op. cit, supra,* 15 Cal. Western L.Rev. at pp. 67-72.) (For a discussion of the similarities and differences between § 5410 and §§ 5803-5805, see *Zurich Ins. Co.* v. *Workmen's Comp. Appeals Bd.* (1973) 9 Cal.3d 848, 854-858 [109 Cal.Rptr. 211, 512 P.2d 843] (conc. opn. of Sullivan, J.); Mastoris, *op. cit. supra,* 15 Cal. Western L.Rev. at pp. 67-72; Cal. Workmen's Comp. Practice (Cont.Ed.Bar 1973) *supra,* § 12.8.)

■ The fact that Aliano's condition may now be worse than at the time of the original decision, standing alone, does not justify the reopening of his case upon the theory of "new and further" disability. (See *Pizza Hut of San Diego, Inc.* v. *Workers' Comp. Appeals Bd., supra,* 76 Cal.App.3d at p. 825; *Westvaco etc. Corp.* v. *Ind. Acc. Com.* (1955) 136 Cal.App.2d 60, 64-68 [288 P.2d 300]; *Kauffman* v. *Industrial Acc. Com.*(1918) 37 Cal.App. 500, 502-503 [174 P. 690]; 1 Hanna, *op. cit. supra,* § 9.03 [2]; 1 Herlick, *op. cit. supra* , § 14.5; Cal. Workmen's Compensation Practice (Cont.Ed.Bar 1973) § 4.21, pp. 108-109.) As the original decision held that there was no connection between the industrial injury and Aliano's condition, Aliano may not attempt to retry the issue of work-connection through the device of a reopening on the grounds of "new and further" *disability.* (3 Larson, Workmen's Compensation Law (1976) § 81.32.) The worsening of Aliano's condition may have been simply due to the progression of viral encephalitis and other disorders related thereto rather than an industrial injury. The worsening of Aliano's condition however might establish that the original diagnosis of viral encephalities was wrong (as when the worsening of the condition is medically inconsistent with viral encephalitis but consistent with head trauma) and thus go to establish "good çause" to reopen.

■ To reopen for "good cause" there must exist some ground, not within the knowledge of the appeals board at the time of making the former award or orders which render said original award or orders inequitable; this cannot be premised upon a mere change of *opinion* by the appeals board. (*Walters* v. *Industrial Acc. Com., supra,* 57 Cal.2d 387, 394.) "Merely cumulative" evidence is insufficient for "good cause." (*Id.* at p. 395.) In the absence of "good cause," the appeals board is powerless to act. (*Merritt-Chapman & Scott Corp.* v. *Indus. A.C.* (1936) 6 Cal.2d 314, 315-317 [57 P.2d 501].) What consitutues "good cause" depends largely on the circumstances of each case. (*Bartlett Hayward Co.* v. *Indus. Acc. Com.* (1928) 203 Cal. 522, 532 [265 P. 195].) While the WCAB's determination of what constitutes "good cause" may be accorded great weight it is not conclusive. (*Ibid.*)

■ We agree with the WCAB that the circumstances of this case warrant reopening for "good cause." The "good cause" here is Eldorado's failure to fulfill its duty to *adequately and fairly* investigate Aliano's claim prior to the original decision and to present the full medical picture to the board.

■ While the employee has the burden of proving that his injury was sustained in the course of employment (*Lamb* v. *Workers' Comp. Appeals Bd.* (1974) 11 Cal.3d 274, 280 [113 Cal.Rptr. 162, 520 P.2d 978]; *Garza* v. *Workmen's Comp. App. Bd. (1970)* 3 Cal.3d 312, 317 [90 Cal.Rptr. 355, 475 P.2d 451]; *Lundberg* v. *Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 436, 439 [71 Cal.Rptr. 684, 445 P.2d 300]), "'[u]pon notice or knowledge of a *claimed* industrial injury, an employer has both the right and the *duty to investigate the facts* in order to determine his liability for workmen's compensation, but he must act with expedition in order to comply with the statutory provisions for the payment of compensation which require that *he take the initiative in providing benefits.'"* (Italics added.) *(Dorman* v. *Workers' Comp. Appeals Bd.* (1978) 78 Cal.App.3d 1009, 1020 [144 Cal.Rptr. 573]; *Ramirez* v. *Workmen's Comp. App. Bd.* (1970) 10 Cal.App.3d 227, 234 [88 Cal.Rptr. 865].) ■ The facts of this case demonstrate that in conjunction with the original proceedings, Eldorado's failure to properly and fairly investigate and present the facts relative to Aliano's claim was the *cause* of the erroneous original decision.

The physicians purporting to support the original decision are Drs. Saliba, Korbin, Parks and Jones. Dr. Korbin initially agreed with the diagnosis of viral encephalitis but in his final report of October 20, 1972, stated that he had "assumed" that Aliano's condition was related to viral encephalitis and therefore suggested further testing since he could not understand the long duration of Aliano's symptoms; the consultations obtained thereafter were from Dr. Jones and Dr. Parks, neither of whom resolved the matter. Dr. Parks' diagnosis was inconclusive as to diagnosis and he wished to review the prior medical records; Eldorado then failed to provide Dr. Parks with the complete prior medical records so he could render a final diagnosis. Dr. Jones was equally inconclusive. Dr. Jones stated that "If [the] diagnosis of encephalitis was confirmed by...Northridge Hospital," then Aliano's problem was nonindustrial; thus, Dr. Jones does not diagnose viral encephalitis but defers to Northridge Hospital. Reliance upon Dr. Saliba for the diagnosis of viral encephalitis is also questionable. Dr. Saliba's report was dictated on August 10, 1972, which was *before* the availability of the laboratory test results of August 11 and 15, 1972, which proved negative for viral encephalitis. Indeed, it was Dr. Saliba who recommended these laboratory tests yet inexplicably made his report without a review or comment upon these laboratory test results.

While Dr. Saliba has not now commented upon the importance of the laboratory test results (and it would have been preferable for Aliano to have obtained a supplemental opinion from Dr. Saliba on the issue), upon the petition to reopen, the unrebutted medical opinion is that the Northridge Hospital laboratory tests disprove a diagnosis of viral encephalitis.[16] This vital piece of evidence was not before the WCJ at the time of the original decision.

Eldorado had authorized Northridge Hospital for testing and diagnosis. This strongly suggests that Eldorado had or should have had the total Northridge Hospital file.

If Eldorado had had possession or control of the Northridge Hospital laboratory test results, their significance prior to the original decision would have been known or constructively known, and the failure of Eldorado to bring the results to the attention of Drs. Saliba, Korbin, Parks, and Jones and the WCJ would clearly establish "good cause" to reopen. Such failure to fairly present the medical diagnosis would be considered equivalent to willful suppression of a medical report in violation of WCAB Rules sections 10608 and 10615 which require a party to file with the appeals board and serve upon all other parties *all* medical reports the first party has under his possession or control. While WCAB Rules section 10626 does not require service of hospital records, the willful suppression of such vital evidence would have constituted a fraud upon the WCAB as well as a breach of duty by Eldorado to properly investigate and fairly present the facts relative to Aliano's claim.

Eldorado knew that such laboratory tests were to be done as Dr. Saliba recommended such tests in his report. Further, in conjunction with the original proceedings Eldorado did submit *portions* of the North-

---

[16]Upon the petition to reopen had Dr. Saliba reaffirmed his diagnosis of viral encephalitis notwithstanding the laboratory test results and all the additional medical reports to the contrary, "good cause" for reopening would have not existed as no error in the original decision would have been shown.

The appeals board has in the past held "good cause" to exist where the original decision was based upon a physician's medical opinion which the same physician later subsequently changed. (*Payton v. City of San Luis Obispo* (1945) 10 Cal.Comp.Cases 279.) However, there is also appeals board authority to the contrary. (*Pacific Employers Ins. Co. v. I.A.C. (Bentley)* 10 Cal.Comp.Cases 280.) One text supports the view that an acknowledgement of mistake by a key medical witness upon whose testimony great reliance was placed establishes good cause to reopen. (3 Larson, *op. cit. supra,* § 81.52, pp. 15-542 to 15-543, 15-545 to 15-546; see *Stimburis v. Leviton Mfg. Co.* (1959) 5 N.Y.2d 360 [184 N.Y.S.2d 632].)

ridge Hospital records.[17] Thus, the inference is that Eldorado knew or should have known of the laboratory test results. There is no direct evidence, however, that Eldorado willfully suppressed the laboratory test results, but it is inferable that it negligently presented the medical facts applicable to the original proceedings.

Dr. Saliba recommended the laboratory test results as expressly stated in his report yet Eldorado did not solicit a supplemental report from Dr. Saliba on what the laboratory tests showed. When Dr. Korbin later questioned the diagnosis of viral encephalitis, Eldorado obtained consultations from Dr. Parks and Dr. Jones. Dr. Parks requested the past medical records which Eldorado never provided him. Dr. Jones, as noted above, deferred the diagnosis of viral encephalitis to Northridge Hospital. We can only assume that had Dr. Jones and Dr. Parks been provided with all the prior medical records they would have negated any diagnosis of viral encephalitis.

Analogous is the case of *Fidelity & Cas. Co.* v. *Industrial Acc. Com.* (1959) 176 Cal.App.2d 541 [1 Cal.Rptr. 567], which involved a claim for workers' compensation death benefits. The decedent was employed at a construction camp in Indonesia when he fell off a dock where he had originally planned to go swimming. Initially the claim by the dependents was denied by the commission and the dependents filed no petition for reconsideration. Six months after the initial decision the dependents filed a petition to reopen alleging the discovery of new evidence. The commission granted the petition to reopen, reversed its original decision and awarded death benefits. The petitioner, carrier for the employer, argued that the commission erred in reopening the case without a showing of good cause for such action because it had become final. Affirming the commission, the court stated: "*Without regard to whether or not evidence presented on the hearing of the 'Petition to Reopen' could have been obtained and presented during the hearing that preceded the denial of compensation,* it is clear that evidence was received at the hearing at the petition to reopen which completely changed the picture. It was shown that the pier area to which decedent had repaired to go swimming was in fact controlled by the employer; it was further shown, which certainly did not clearly appear during the prior proceedings, that decedent was on 24-hour duty. It is apparent from the record that it was these two additional factors which persuaded, and as we have held properly persuaded, respondent commission to

[17]These portions of the Northridge Hospital records had been submitted to the appeals board by a claims examiner for Eldorado.

change its decision. *While there may not have been a strict compliance with procedural rules, it is clear that the final decision was made upon evidence substantially different from that which had been before the commission on the prior decision, that nothing was shown that was not presumptively known to petitioners, and that the final decision was in accord with the full record.* Under such circumstances we would not annul the award. (*Merritt-Chapman & Scott Corp.* v. *Industrial Acc. Com.*, 6 Cal.2d 314, 317 [57 P.2d 501].)" (Italics added.) (*Fidelity & Cas. Co.*, v. *Industrial Acc. Com.*, *supra*, 176 Cal.App.2d at pp. 545-546.)

*Fidelity & Cas. Co.* demonstrates that in an extreme case and the case before us is an extreme one, the WCAB does not err in granting the petition to reopen in light of the clearly inequitable original decision based upon medical reports which would not constitute substantial evidence. The questionable nature of the diagnosis of viral encephalitis was known, or should have been known, to Canoga/Eldorado and it failed to fulfill its obligation to adequately investigate and present the matter.

We are cognizant that the general rule is that the failure to timely seek reconsideration may not be remedied by a petition to reopen. (*Kaiser Foundation Hospitals* v. *Workers' Comp. Appeals Bd.* (*Vornado, Inc.*) (1978) 82 Cal.App.3d 39 [147 Cal.Rptr. 30]; *Royster* v. *Workmen's Comp. Appeals Bd.* (1974) 40 Cal.App.3d 412 [115 Cal.Rptr. 210]; *Young* v. *Ind. Acc. Com.* (1944) 63 Cal.App.2d 286 [146 P.2d 693]; *United States Pipe & Foundry Co.* v. *Industrial Acc. Com.*, *supra*, 201 Cal.App.2d 545.) We are of the opinion, however, that the peculiar facts of this case bring Aliano's petition to reopen within the exception for there is "good cause" to reopen. (1 Herlick, *op. cit., supra*, § 14.6, p. 498.)

In sum, the finding of good cause is amply supported by the evidence.

**B. Finding Injury to the Neck Was Not Precluded by the Original Decision**

Canoga/Eldorado object to the finding in the decision granting reopening of injury to the neck. Canoga/Eldorado point out that the original decision only found injury to the "head."

First we observe that it is possible to argue that the head includes the neck; the WCJ in his original decision may well have not used the word

"head" in the narrow sense suggested by Canoga/Eldorado. Secondly, the record reveals that after the industrial injury Aliano did in fact complain of neck discomfort. In addition, the finding in the original decision of injury to the head did not preclude finding of injury to the neck in the decision granting reopening in light of there being "good cause." Also, the original decision was concerned with whether the continuing disability was related to the industrial injury or viral encephalitis. The original decision concluded viral encephalitis was the cause. Thus, any finding in the original decision as to parts of the body injured in the industrial accident was not the material issue. (See *Casualty Ins. Co.* v. *Industrial Acc. Com.* (1964) 226 Cal.App.2d 748, 755-758 [38 Cal.Rptr. 364]; *American Can Co.* v. *Industrial Acc. Com.* (1961) 196 Cal.App.2d 445, 451 [16 Cal.Rptr. 424].)

**■ C. Canoga/Eldorado Have Not Shown That the Neck and Psychiatric Disability Should Not Have Been Rated Separately**

Canoga/Eldorado also contend that it was error for Aliano to be rated for separate neck and psychiatric disability. (See *Morgan* v. *Workers' Comp. Appeals Bd.* (1978) 85 Cal.App.3d 710, 724-726 [149 Cal.Rptr. 736].) They assert that the neck and psychiatric disability are interrelated; that is, the neck subjective complaints may merely be a manifestation of the neurosis, or the reverse, the neurosis may be a manifestation of the subjective complaints. While this *might* be the case, as the WCAB's opinion pointedly observes, Canoga/Eldorado refer to no medical evidence supporting this argument. Canoga/Eldorado should have developed the record on this point at the hearing level. Accordingly, this contention by Canoga/Eldorado must be rejected.

**D. Rating of Subjective Complaints as to Neck Disability**

**■** Canoga/Eldorado also object to the manner in which the rater determined the standard rating for the neck disability. The WCJ described the disability as "constant slight to less than moderate pain in the neck." As stated above, the rater testified that "constant slight pain" would rate 10 percent and that "constant moderate pain" would rate 50 percent, and that he averaged the two for the resultant 30 percent standard rating. The rater indicated that he did not disregard that part of the WCJ's instruction that set the upper limit of the pain as

"less than moderate," but that in his opinion "less than moderate" was within the range of "moderate."

██ The rating of the subjective complaints regarding the neck disability involves a "judgment rating." That is, the rater must determine the rating in this case by comparing the condition under consideration with the scheduled disability in the California Permanent Disability Rating Schedule (rating schedule) most nearly resembling it, by analogy to a scheduled disability, or by comparison with the entire scheme of scheduled disabilities. Such nonscheduled ratings call for an estimate which is based in part upon the judgment of the rater. (*Dept. of Motor Vehicles* v. *Workmen's Comp. Appeals Board (Payne)* (1971) 20 Cal. App.3d 1039, 1044-1045 [98 Cal.Rptr. 172].)

██ In this case, the rater was required to use his expert opinion on how to rate the subjective factors of the neck disability as described by the WCJ. Canoga/Eldorado presented no evidence in rebuttal (such as by another expert in rating of disabilities under the rating schedule) to the rater's judgment in this case. Accordingly, we cannot say the WCAB erred in accepting the rater's evaluation.

██ E. Canoga/Eldorado Have Not Shown Error
in the Rating of Aliano's Psychiatric
Disability on the Basis of a Slight to
Moderate Neurosis.

Canoga/Eldorado contend that it was error to rate Aliano's psychiatric permanent disability on the basis of a "slight to moderate neurosis" as rating the disability on such basis does not reflect the extent of work disablement. (See *Nielsen* v. *Workmen's Comp. Appeals Bd.* (1974) 36 Cal.App.3d 756 [111 Cal.Rptr. 796].)

The terms "slight" and "moderate" for the rating of permanent psychiatric impairment are contained in the rating schedule which has been adopted by the administrative director of the Division of Industrial Accidents (of the Department of Industrial Relations) pursuant to the authority of section 4660, subdivision (b). (*Mihesuah* v. *Workers' Comp. Appeals Bd.* (1976) 55 Cal.App.3d 720, 736-737 [127 Cal.Rptr. 688].) ██ Pursuant to section 4660, subdivision (b), the descriptive factors of disability as set forth in the rating schedule are prima facie evidence of the percentage of permanent disability for the particular

scheduled disability. (*Dept. of Motor Vehicles* v. *Workmen's Comp. Appeals Bd. (Payne), supra,* 20 Cal.App.3d at p. 1043; see also *Young* v. *Ind. Acc. Com.* (1940) 38 Cal.App.2d 250, 255 [100 P.2d 1062].)

The rating schedule classifies psychiatric impairment in the term of "very slight," "slight," "moderate," "severe" and "pronounced." The standard rating (the rating before adjustment for age and occupation) for these terms are 10, 20, 50, 65 and 100 percent respectively.

 The fact that the rater was unable to precisely define how a "slight to moderate neurosis" affects Aliano's ability to work does not require annulment of the rating. The rater's role is to apply the rating schedule to the factors of permanent disability as found by the WCJ or the WCAB. (*Pence* v. *Industrial Acc. Com.* (1965) 63 Cal.2d 48, 51 [45 Cal.Rptr. 12, 403 P.2d 140]; *Allied Comp. Ins. Co.* v. *Ind. Acc. Com.* (1961) 57 Cal.2d 115 [17 Cal.Rptr. 817, 367 P.2d 409]; *Morgan* v. *Workers' Comp. Appeals Bd., supra,* 85 Cal.App.3d 710, 725.) The rater thus is not required to know how the disability factors set forth in the rating schedule relate to diminished work capacity as he is an expert witness only in the application of the rating schedule. (See *Mihesuah, supra,* 55 Cal.App.3d at p. 728.)

As the WCAB pointed out in its opinion Canoga/Eldorado have failed to produce any rebuttal to the prima facie evidence established by the rating schedule. Accordingly, we reject Canoga/Eldorado's attack on the rating of the psychiatric impairment on the basis of a "slight to moderate neurosis."

 F. Substantial Evidence Supports the
Findings on Apportionment

Canoga/Eldorado argue that in addition to the 50 percent apportionment of the neck disability, there should have been apportionment of the psychiatric disability as part preexisting the industrial injury and to Aliano's alleged preexisting back disability. (§§ 4663, 4750.)

Dr. Conrad, whose opinion was solicited by Canoga/Eldorado, opined that Aliano had no industrial psychiatric disability. Dr. Conrad's report thus raises the issue of apportionment. In rebuttal to Dr. Conrad, Aliano has the opinion of Dr. Gould. (See *Market Basket* v. *Workers' Comp. Appeals Bd.* (1978) 86 Cal.App.3d 137, 146-147 [149 Cal.Rptr.

872].) Dr. Gould opined that there was no basis for apportionment to nonindustrial psychiatric disability as in his opinion in absence of the industrial injury there would be no psychiatric *disability*. At best, Canoga/Eldorado have shown prior symptons which may not necessarily demonstrate there would be any psychiatric disability in absence of the industrial injury. On the other hand, Dr. Gould's express opinion on apportionment constitutes substantial evidence. (*Ibid.*) Thus, refusal to apportion the psychiatric disability as in part nonindustrial is affirmed as it is supported by substantial evidence. (*Franklin* v. *Workers' Comp. Appeals Bd.* (1978) 79 Cal.App.3d 224, 235 [145 Cal.Rptr. 22].)

Canoga/Eldorado's claim of apportionment to Aliano's preexisting back problems is based upon the well-established principle that where there is preexisting disability the permanent disability from an industrial injury is compensable only to the extent the injured employee has a decrease in his earning capacity or ability to compete in the open labor market. Thus, if prior to the industrial injury the injured has a permanent disability there is apportionment to the extent the industrial injury does not decrease his earning capacity or ability to compete. This rule of apportionment of "overlapping disabilities" applies even if the industrial injury involves a different part of the body than the preexisting disability. (*Mercier* v. *Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 711 [129 Cal.Rptr. 161, 548 P.2d 361]; *State Compensation Ins. Fund* v. *Industrial Acc. Com. (Hutchinson)* (1963) 59 Cal.2d 45 [27 Cal.Rptr. 702, 377 P.2d 902]; *Johns-Manville Products Corp.* v. *Workers' Comp. Appeals Bd.* (1978) 87 Cal.App.3d 740 [151 Cal.Rptr. 215]; *State Comp. Ins. Fund* v. *Workers' Comp. Appeals Bd. (Gaba)* (1977) 72 Cal.App.3d 13 [139 Cal.Rptr. 802].)

While Canoga/Eldorado have shown some prior back *problems*, the precise level of preexisting back *disability* is not clear. Further, and more importantly, there has been no showing by Canoga/Eldorado how the alleged preexisting back disability "overlaps" with the disability from the industrial injury herein. Thus, the situation here is unlike *Gaba, supra,* 72 Cal.App.3d 13 and *Johns-Manville, supra,* 87 Cal.App.3d 740 where the court annulled the WCAB's refusal to find overlapping disabilities. In each case the employer had presented clear evidence of a preexisting overlapping disability which the injured employee failed to refute. Here, however, Canoga/Eldorado have failed to present a sufficient case upon which a finding of overlapping disabilities can be based.

### G. The WCAB Erred on Reconsideration When It Reduced the Permanent Disability Award

The record clearly establishes that Aliano's "slight to moderate" neurosis should have been rated at a 35 percent standard rating. The WCJ's statement that the rating should have been only a 30 percent standard was based upon an error in his summary of evidence.

Accordingly, we annul this portion of the WCAB's decision which reduced the permanent disability rating.

Canoga/Eldorado assert that Aliano may not now raise this issue as he did not first request the WCAB to reconsider its decision; this assertion has no merit. When the WCAB on reconsideration modified the award upon the petition for reconsideration by Canoga/Eldorado, Aliano could either seek reconsideration by the WCAB or could directly seek judicial review by a petition for writ of review. There was no requirement for Aliano to have first sought reconsideration. (*Goodrich v. Ind. Acc. Com.* (1943) 22 Cal.2d 604, 611 [140 P.2d 405].)

## IV. DISPOSITION

Aliano requests that pursuant to section 5801 attorneys' fees be assessed against Canoga/Eldorado as there was no reasonable basis for their petition. (*Employers Mut. Liab. Ins. Co.* v. *Workmen's Comp. Appeals Bd.* (1975) 46 Cal.App.3d 104, 104, fn. 2 [120 Cal.Rptr. 48].) We conclude, however, there was a reasonable basis for the petition. Accordingly, the request for attorneys' fees is denied.

The WCAB decision is annulled only with respect to its reduction of the permanent disability award from 50½ percent disability to 45½ percent disability. The decision of the WCAB is otherwise affirmed. The matter is remanded to the WCAB for such further proceedings as are consistent with the court's opinion.

Kaus, P. J., and Ashby, J., concurred.

A petition for a rehearing in No. 54095 was denied January 15, 1980.